459 F.2d 811
 79 L.R.R.M. (BNA) 2803, 81 L.R.R.M. (BNA) 2158,
4 Fair Empl.Prac.Cas. 454,
4 Empl. Prac. Dec. P 7722,
5 Empl. Prac. Dec. P 8005, 67 Lab.Cas. P 12,504,
69 Lab.Cas. P 12,965
 James MOORE, Plaintiff-Appellant,
v.
SUNBEAM CORPORATION and International Association of
Machinists and Aerospace Workers, Local 1129,
Dist. No. 8, Defendants-Appellees.
James A. MOORE, Jr., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Sunbeam
Corporation, Intervenor.
 Nos. 18366, 18779.
 United States Court of Appeals,
Seventh Circuit.
 March 10, 1972.
Rehearing Denied May 23, 1972.
As Amended June 27, 1972.
 
 Peter A. Flynn, James Moore, Jenner & Block, Chicago, Ill., for petitioner-appellant.
 James G. Davis, Michael A. Warner, Chicago, Ill., for defendant-appellee and intervenor Sunbeam Corporation; Pope, Ballard, Kennedy, Shepard & Fowle, Chicago, Ill., of counsel.
 Sheldon M. Charone, Sherman Carmell, Stuart Litwin, Chicago, Ill., for defendant-appellee, District 8, I.A.M.; Plato Papps, Washington, D. C., Carmell & Charone, Chicago, Ill., of counsel.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael S. Winer, Atty., National Labor Relations Board, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Atty., National Labor Relations Board, for respondent.
 Before KILEY, CUMMINGS* and STEVENS, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 James Moore was discharged by Sunbeam Corporation on October 17, 1967. He claims that the corporation committed an unfair labor practice, that his union[1] breached its duty to represent him fairly, and that he is the victim of racial discrimination proscribed by the Civil Rights Act of 1964. His appeals from adverse rulings by the Labor Board and the district court were consolidated in this court. In brief, the issues are whether the Board correctly construed the collective bargaining agreement; whether the union was required to submit Moore's grievances to arbitration; and whether Moore's civil rights claims are barred as untimely.
 
 
 2
 Although the three issues arise out of the same transaction, many factual details relate primarily to only one issue. We shall, therefore, start by considering the unfair labor practice charge which was the subject of a full evidentiary hearing before a Labor Board Trial Examiner. We shall then discuss the basis for the summary judgments entered in favor of the union and the employer, respectively, in the district court action.
 
 I.
 
 3
 The union represents approximately 2,400 employees in five plants operated by Sunbeam in the Chicago area. Moore, a union member, was one of approximately 1,200 employees at the main plant.
 
 
 4
 In the collective bargaining contract Sunbeam agreed to a four-stage grievance procedure, culminating, if the union so demanded, in arbitration. On its part, the union, for itself and for its members individually, broadly agreed not to strike, to picket, or to encourage any interference with orderly production.[2] During the course of his employment[3] Moore initiated several grievance proceedings[4] and filed four unfair labor practice charges against Sunbeam. Apparently none of the grievances was successful. Two of the Labor Board charges were withdrawn voluntarily;[5] the general counsel refused to issue complaints on the other two.[6] Frustrated by his inability to obtain relief through regular channels, in February of 1967 Moore wrote to the president of Sunbeam requesting a personal interview. He was advised that the president would not set a precedent by meeting with an individual employee on a grievance matter.
 
 
 5
 On August 11, 1967, Moore again wrote to Sunbeam's president demanding a meeting with him and with the union's district representative (Janas). The letter reviewed Moore's unredressed grievances and expressed his feeling that "top management is systematically denying me the opportunity to advance to the full extent of my ability . . . only because I am a Negro." He stated that if a meeting could not be arranged, "the only alternative [is] to present my grievance to my co-workers, and the public." Surprisingly, this letter evoked no response whatsoever from Sunbeam.[7]
 
 
 6
 In late September Moore added a few paragraphs to his unanswered letter, labeled it an "Open Letter to Mr. Robert P. Gwinn, President," and made 3,500 copies for distribution to various public officials and agencies, his fellow employees, and members of the public. The added paragraphs asked for support in making equal opportunity in employment a fact and requested supporters to "refrain from buying any Sunbeam appliances . . . until justice has been served." At the end of the open letter Moore stated that he would march in front of the Sunbeam plant on October 24, 1967, "in protest of the conditions here."
 
 
 7
 On October 2, 1967, Moore gave a copy of the open letter to a fellow employee and discussed it briefly with her. Later that day the letter came to the attention of Sunbeam's Personnel Department and on October 3 Moore was suspended. He distributed his "petition" at various plant gates that day and on the next three days.
 
 
 8
 During this period he had several discussions with union representatives. On October 5 Janas prepared a grievance covering Moore's suspension; at that time Janas advised Moore that his actions violated the union contract. Accordingly, Janas responded to inquiries from union stewards by advising that the union would not sanction picketing by Moore. Moore nevertheless insisted that he would march on October 24 without union support.
 
 
 9
 On October 11 a second stage grievance meeting regarding Moore's suspension was held. Nothing was resolved. On October 17 he was discharged. Both the discharge letter and a letter written to the union on the same day relied, in part, on the ground that Moore was seeking to encourage a strike and product boycott in violation of the union contract.
 
 
 10
 On October 24 Moore did picket for most of the day, but with almost no support from fellow employees. It is reasonably accurate to state that although he attempted to engage in collective or concerted activity, he actually conducted a one-man demonstration.
 
 
 11
 A week later a third step grievance meeting was held, but the company refused to reinstate Moore. The union subsequently rejected Moore's request for arbitration of his suspension and discharge grievance.
 
 
 12
 Thereafter, Moore filed unfair labor practice charges against both the union and the company. The charge against the union was dismissed. The general counsel issued a complaint against Sunbeam alleging that its rule against solicitation by employees was too broad and that Moore had been discharged for engaging in concerted activity protected by Sec. 7 of the Labor-Management Relations Act.
 
 
 13
 The Trial Examiner and the Board found the solicitation rule invalid, but upheld the discharge. No issue involving the rule is before us since Sunbeam has made the modification directed by the Board.
 
 
 14
 Although both the Trial Examiner and a majority of the Board concluded that Moore's activity was not protected by the Act, their reasoning was different. The Trial Examiner, stressing the individual character of Moore's campaign, found that his activity was not "concerted," and therefore not covered by the statute. The Board, stressing his expressed intentions and requests rather than his accomplishments, regarded his activity as "concerted," but prohibited by the nostrike clause of the contract. The dissenting member of the Board agreed that Moore was engaged in concerted activity, but felt that he did not violate the no-strike clause.
 
 
 15
 Certain propositions of law are not disputed. There are kinds of concerted activity that are not protected by the Act. N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298. Specifically, conduct which violates a no-strike clause in a collective bargaining agreement is not protected and may give rise to discharge. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 246, 82 S.Ct. 1318, 8 L.Ed.2d 462. The critical question here is whether Moore's conduct violated Article 1, Paragraph 5, of the agreement between Sunbeam and the union.
 
 
 16
 In answering this question we do not merely consider dictionary definitions of the word "strike," or even judicial interpretations of that term in other contexts. Of greater importance is the understanding of the parties who negotiated and drafted the contract before us, the interpretation of administrators who specialize in labor relations matters, and the purpose which the contractual provision was intended to serve. We thus put to one side the dissenting Board member's persuasive exposition of why Moore's conduct was not a conventional strike.
 
 
 17
 Moore had embarked on an independent effort to resolve his dispute with his employer by means other than those which the union, on his behalf, had agreed to employ. In substance, the union and its individual members had agreed to abstain from economic warfare or collective pressures during the term of the contract. To the extent that Moore's conduct can properly be viewed as concerted, it was directly opposed to the intent of the no-strike clause. He asked his co-workers to "refrain from buying any Sunbeam appliances" and for support "to obtain . . . better working conditions for all Sunbeam employees."[8] The company, quite reasonably, viewed this overture to collective action as a violation of the employees' agreement not to encourage any interference with work or any picketing of the company's plant or premises.
 
 
 18
 Of greater significance, the union agreed with this construction of the contract. Janas so advised Moore in advance of the discharge, but Moore nevertheless persisted in his independent course of action. After the discharge, the union declined to submit the matter to arbitration. The union's interpretation of the scope of its own undertaking is entitled to considerable respect.[9]
 
 
 19
 We also respect the Labor Board's appraisal of the issue. Cf. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. It might be argued that that case applies only to questions of fact decided by the Board and that we are not bound to follow the Board's construction of written instruments.[10] It does not follow, however, that the expertise of the Board is not relevant in the interpretation of a labor contract. When, as in this case, the facts must be interpreted in connection with the contract language, the function of the Board in promoting the national labor policy is particularly important. The policy considerations discussed by the Supreme Court in N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, deserve mention:
 
 
 20
 "Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life [cite], and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' [cite] 'The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review."' 373 U.S. at 236, 83 S.Ct. at 1150.
 
 
 21
 There is an undeniable national labor policy to promote arbitration. Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972, see also Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199. No-strike pledges constitute the quid pro quo for a binding arbitration agreement, Lincoln Mills, 353 U.S. at 455, 77 S.Ct. 923; Boys Markets, 398 U.S. at 247-248, 90 S.Ct. 1583; United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed.2d 1403, and may even be enforced by injunction notwithstanding Sec. 4 of the Norris-LaGuardia Act. Boys Market, 398 U.S. at 249-253, 90 S.Ct. 1583. A no-strike pledge may even be implied. Teamsters Local 174, Teamsters, Chauffeurs, etc. v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593. Since the contract before us contains an express no-strike pledge, we think it is reasonable to defer to the Board's broad interpretation of that clause as applied to the facts before it. Its interpretation is entirely consistent with the national labor policy and with the union's own understanding of the agreement.
 
 
 22
 In addition to the argument that the Board misconstrued the contract, Moore argues that in any event the discharge was not predicated on his breach of contract. The record does indicate that additional factors motivated the company and the no-strike clause was not mentioned in the suspension letter on October 4.[11] However, the discharge letter on October 17 did rely, in part, on the charge that Moore was encouraging a strike and a boycott,[12] and the letter to the union on the same day specifically identified the relevant provision of the contract. The evidence does not support Moore's contention that his breach of the contract was a subsequently contrived justification for the October 17 discharge. On the contrary, it is clear that the Board's decision was supported by substantial evidence. On this factual question, the rule of Universal Camera, supra, is unquestionably applicable.
 
 II.
 
 23
 About a year after his discharge, Moore filed a three-count complaint against Sunbeam and the union. Federal jurisdiction was invoked under Title VII of the Civil Rights Act of 1964[13] as to count I and under Sec. 301(a) of the Labor-Management Relations Act[14] as to counts II and III. The civil rights counts is dealt with in Part III of this opinion. We here consider the two counts brought under Sec. 301 for breach of the collective bargaining agreement. Summary judgment for Sunbeam and the union was granted on both Sec. 301 counts.[15]
 
 
 24
 The structure and allegations of the complaint make it clear that Moore was attempting to come within the Sec. 301 jurisdiction of the district court as formulated by the Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L. Ed.2d 842. The Court said, "Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." Id. at 184, 87 S.Ct. at 914. The union's contract with Sunbeam contained both nostrike and binding arbitration clauses,[16] accordingly, the Vaca decision is applicable. The Supreme Court specified two circumstances which would nevertheless permit a Sec. 301 suit: (1) when the conduct of the employer amounts to a repudiation of the contractual procedures, or (2) when the union has sole power to invoke the higher stages of the grievance procedure and wrongfully refuses to process the grievance. Id. at 185, 87 S. Ct. 903.
 
 
 25
 Moore has not alleged that Sunbeam repudiated the contractual grievance provisions with respect to any of the incidents described in the complaint. He predicates Sec. 301 jurisdiction on only two specific incidents: a failure to promote him to a leadman position on October 24, 1966; and the suspension and discharge in October, 1967. In his deposition, two additional specific matters are discussed: the failure to assign him appropriate leadman work when he held that position in department 437 from October 25, 1966, to December 14, 1966; and his allegedly improper transfer from a leadman position to power truck operator on January 10, 1967. Moore testified that grievances were instituted and processed as to the October 24, 1966, incident and as to his work assignment between October 25 and December 14. These grievances were not, however, carried to arbitration. No grievance was filed as to the January 10 transfer; Moore clearly failed to exhaust contractual remedies on that issue. Finally, as indicated in part I of this opinion, the suspension and discharge issue was taken through the third step grievance procedure. Sunbeam did not repudiate the contractual procedure either as to specific incidents mentioned in the complaint or as to those discussed by Moore in his deposition.[17]
 
 
 26
 Moore's only possibility of coming within the Vaca standards, therefore, is to establish a wrongful refusal on the part of the union to take the grievances to arbitration. The Supreme Court held in Vaca that a union has no mandatory obligation to submit every employee claim to arbitration. 386 U.S. at 191-192, 87 S.Ct. 903. A labor contract must be construed in its totality. Unfortunately, Moore has not placed before us a complete copy of the contract in question;[18] he merely quotes portions of it in his complaint. However, we are assuming that the contract contained a nostrike clause and a clause making the grievance procedure exclusive,[19] with binding arbitration at the discretion of the union. Thus, part of the consideration for management's agreeing to the entire contract package was that it could rely on the union to screen grievances and demand arbitration only on those which the union in good faith thought meritorious. Moore, in accepting the benefits of the labor agreement also had to accept its burdens-in this case he had no choice but to rely on the grievance procedure specified, which included the provision that the union could decide whether or not to demand arbitration.
 
 
 27
 The Supreme Court in Vaca left no doubt that a union owes its members a duty of fair representation, but that opinion also makes it clear that the union may exercise discretion in deciding whether a grievance warrants arbitration. Even if an employee claim has merit, a union may properly reject it unless its action is arbitrary or taken in bad faith. 386 U.S. at 193, 87 S.Ct. 903. In this case we believe the union properly evaluated the merits of Moore's claims and can find no basis for the charge that it did not fairly represent him simply because it terminated the grievance proceedings at the third stage and did not demand arbitration of his claims, which were dubious at best.[20]
 
 
 28
 The summary judgment dismissing Moore's Sec. 301 claims is affirmed.
 
 III.
 
 29
 In a separate order entered on February 3, 1970, the district court dismissed Moore's civil rights claims. He had alleged that Sunbeam had discriminated against him because of his race by denying him a position as "leadman" on October 24, 1966, and thereafter by engaging in "continuous harassment and discrimination." The district court held that the allegations based on the October 24, 1966, incident were untimely, and that those asserting continuous discrimination had not been the subject of a charge filed with the Equal Employment Opportunity Commission.
 
 
 30
 Before analyzing the specific timeliness issues presented by this record, a brief comment on the statutory scheme is necessary. As a part of a compromise which made it possible to pass the Civil Rights Act of 1964, its sponsors agreed to the inclusion of provisions which impose an extremely short limitations period on private claims and require a resort to state procedures, where available, as a condition precedent to a private action in the federal courts.[21] If the state where the alleged violation occurred provides no remedy, the complainant must file his charge with the EEOC within 90 days;[22] if a state remedy is available, it must be exhausted before the federal charge is filed.[23] To allow time for such exhaustion, in such states the charge need not be filed for 210 days; to enforce the exhaustion requirement and give the state agency an adequate opportunity to act first, the federal charge may not be filed until 60 days after the state procedure has been initiated (unless it terminates in less than 60 days).[24]
 
 
 31
 Thus, time limitations include both an outer limit of 210 days from the occurrence[25] and a threshold exhaustion requirement, usually involving a waiting period of 60 days from the date of filing with the state agency.[26] Our problem is whether Moore filed his charge with the EEOC on a date which complied with the threshold requirement and also was within 210 days of the occurrence.
 
 
 32
 The question becomes complicated because we must consider when the statutory period ended as well as when it began, and the parties disagree on both points. The period ended on the date the charge was "filed" with the EEOC; the period began when the alleged unlawful employment practice "occurred" within the meaning of the statute. We therefore consider first, the filing date, and then, the occurrence date or dates.
 
 
 33
 A. The filing date.
 
 
 34
 The filing date of the charge is in dispute. Moore contends that it was on or before October 3, 1967; Sunbeam argues that it was December 21, 1967. A third possibility is October 19, 1967, the date when the formal charge form was submitted to the EEOC. We reject all these choices, however, and hold that December 19, 1967, should be treated as the filing date.
 
 
 35
 Moore's attempt to advance the date to October 3 is based on his inclusion of the EEOC as one of numerous agencies and persons to whom a copy of his open letter to the president of Sunbeam was mailed before he started to distribute it by hand on October 3, 1967. Even if the evidence definitely established a mailing to the EEOC prior to that date, we would not regard that type of communication as an adequate filing of the charge which is intended to initiate action by the EEOC. The letter was not addressed to the Commission, it did not request the EEOC to take any action, and if indeed a copy was received by the EEOC, it was not interpreted by that agency as a charge.[27] We think that interpretation by the agency was proper even under the appropriately liberal standards which should be applied to such a document, cf. Georgia Power Co. v. E. E. O. C., 412 F.2d 462, 466 (5th Cir. 1969). The copy of the letter addressed to Gwinn, which may have been mailed to the EEOC on or about October 3, should not be treated as a filed charge.
 
 
 36
 On October 19, 1967, Moore did submit a charge to the EEOC on an official form. He had not, however, previously filed a complaint with the Illinois Fair Employment Practices Commission.[28] In view of the requirement in Sec. 706(b) that "no charge may be filed" with the EEOC before the expiration of 60 days after proceedings have been commenced with the appropriate state agency, his charge was referred to the state FEPC. On December 21, 1967, after the 60-day period had elapsed, Moore wrote to the EEOC requesting action on his charge;[29] it is that date which Sunbeam urges us to regard as the filing date.
 
 
 37
 Sunbeam's view apparently requires that if a charge is made to the EEOC which is referred to a state agency, then the charge must again be presented to the EEOC, either after the state agency has acted or 60 days after the charge was submitted to the state agency. Thus, Sunbeam would have us hold that the charge could not be considered filed until Moore wrote on December 21 asking the EEOC to resume jurisdiction. That position is now foreclosed by the Supreme Court's recent opinion in Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). In Love, the EEOC orally referred a charge to the state agency and automatically treated the charge as filed when the state agency declined to take action. The court wrote:
 
 
 38
 "The EEOC takes the position that these requirements [as to timeliness] were fulfilled by the procedure followed in this case, whereby a charge filed with the EEOC prior to exhaustion of the state remedy was referred by it to the state agency, and then formally filed once the state agency indicated that it would decline to take action. The Court of Appeals, on the other hand, regarded this procedure as a 'manipulation of the filing date,' not contemplated or permitted by the statute or by the EEOC regulations then in force.
 
 
 39
 "We hold that the filing procedure followed in this case fully complied with the intent of the Act, and we thus reverse the judgment of the Court of Appeals. Nothing in the Act suggests that the state proceedings may not be initiated by the EEOC acting on behalf of the complainant rather than by the complainant himself, nor is there any requirement that the complaint to the state agency be made in writing rather than by oral referral. Further, we cannot agree with the respondent's claim that the EEOC may not properly hold a complaint in 'suspended animation,' automatically filing it upon termination of the state proceedings.
 
 
 40
 "We see no reason why further action by the aggrieved party should be required. The procedure complies with the purpose both of Sec. 706(b), to give state agencies a prior opportunity to consider discrimination complaints, and of Sec. 706(d), to ensure expedition in the filing and handling of those complaints. The respondent makes no showing of prejudice to its interests. To require a second 'filing' by the aggrieved party after termination of state proceedings would serve no purpose other than the creation of an additional procedural technicality. Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers initiate the process." 404 U.S. at 525-527, 92 S.Ct. 616 at 618.
 
 
 41
 Thus, no second "filing" was required. Since the EEOC had received the charge, we treat it as automatically filed upon termination of the state proceedings or 60 days after initiation of the state proceedings, whichever is earlier.[30]
 
 
 42
 Moore argues that his charge should be considered as filed on receipt, pursuant to an EEOC regulation so providing.[31] He argues this would be October 3. We have rejected that date, but must still consider whether Moore's argument can be accepted in order to set the date as October 19, the day the actual charge was received. The Supreme Court has, we think, also foreclosed this approach. In footnote 5 of its opinion in Love, the Court wrote:
 
 
 43
 "The Court of Appeals expressed concern that if EEOC could ignore the requirement of 29 CFR Sec. 1601.11(b) (1971) that a charge is deemed filed when received, it could file any complaint whenever it chose, thereby nullifying the various statutory time requirements. But the statutory prohibition of Sec. 706(b) against filing charges that have not been referred to a state or local authority necessarily creates an exception to the regulation requiring filing on receipt." 404 U.S. at 526, 92 S.Ct. at 618. (Emphasis added).
 
 
 44
 Thus, the Court contemplated that a charge referred to a state agency need not be resubmitted, but nevertheless cannot be treated as "filed" until the 60-day period has expired or until the state has terminated its proceeding, whichever is earlier. Only then can the stated "purpose both of Sec. 706(b), to give state agencies a prior opportunity to consider discrimination complaints, and of Sec. 706 (d), to ensure expedition in the filing and handling of those complaints"[32] be achieved.
 
 
 45
 Although not in effect at the time of Moore's charges, Moore argues that we should either apply a subsequent EEOC regulation or at least interpret the statute itself as having the same meaning. That regulation, in pertinent part, reads:
 
 
 46
 "In cases where the document is filed with the Commission more than 150 days following the alleged act of discrimination but less than 210 days therefrom, the case shall be deferred pursuant to procedures set forth above: Provided, however, That unless the Commission is earlier notified of the termination of the State or local proceeding, the Commission will consider the charge to be filed on the 209th day following the alleged discrimination and will commence processing the case. . . ." 29 C.F.R. Sec. 1601.12(b) (v) (1971).
 
 
 47
 We do not accept that interpretation for three reasons. First, it appears contrary to the Supreme Court's interpretation of the statute in Love, particularly the Court's express recognition of the purpose of Sec. 706(b). Second, it is in conflict with the plain meaning of the statute.[33] Third, it ignores the evidence of congressional intent provided by the statute's history.
 
 
 48
 The provision we are construing resulted from the so-called Dirksen-Mansfield compromise. The legislative history of that compromise indicates clearly that the states were intended to have "exclusive jurisdiction" for at least 60 days before the federal government could act,[34] and also that one who has followed state procedures must nevertheless file (or have a previously submitted charge automatically filed) with the EEOC within 210 days.[35]
 
 
 49
 *****
 
 
 50
 * * *
 
 
 51
 Under the EEOC's regulation, or under the statute if we were to interpret it as having the same meaning, a charge submitted to the EEOC 208 days after a violation occurred would be referred to the state but the next day would be treated as filed and EEOC processing would begin. The state would be denied its period of at least 60 days to attempt to settle the matter without federal intervention.[36]
 
 
 52
 In order to satisfy the clearly stated purposes of both Sec. 706(b) and Sec. 706(d) we therefore hold that Moore's charge was "in suspended animation" for 60 days after it was referred to the state agency and should be treated as automatically filed with the EEOC on December 19, 1967.[37] The charge was therefore timely with respect to any unlawful practice which occurred after May 23, 1967, but not with respect to any which occurred earlier.
 
 
 53
 B. The occurrence dates.
 
 
 54
 In the charge filed with the EEOC, Moore listed August 7, 1967, as the most recent date on which discrimination occurred.[38] We may therefore confine our inquiry to the period between May 23, 1967 (the date determined by subtracting 210 days from the December 19, 1967, filing date) and August 7, 1967.
 
 
 55
 His charge, as well as the affidavit supporting it, was primarily directed at incidents which took place in October of 1966 and January of 1967, but also accused Sunbeam of "continuing" discrimination and harassment prior to August 7, 1967. We first consider whether the earlier incidents should be treated as having occurred at a later date, and then consider the alleged continuing violation.
 
 
 56
 1. Specific incidents.
 
 
 57
 Moore argues that the time in which he might file a charge based on the October 1966 and January 1967 incidents did not begin to run until after he had completed his efforts to reach a private settlement with his employer. In statutory terms, he contends that the incidents did not occur until his employer finally refused to correct the alleged injustices. For this argument Moore relies on Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir. 1970).
 
 
 58
 In Culpepper the court held that an employee's timely invocation of his contractual grievance remedies tolled the Title VII statute of limitations. Notwithstanding Sunbeam's contention that Culpepper does not give proper effect to the statutory language and therefore should not be followed in this circuit, we agree with the following statement by Judge Tuttle:
 
 
 59
 "This court has held many times that Title VII should receive a liberal construction while at all times bearing in mind that the central theme of Title VII is 'private settlement' as an effective end to employment discrimination.
 
 
 60
 ******
 
 
 61
 * * *
 
 
 62
 "It would, therefore, be an improper reading of the purpose of Title VII if we were to construe the statute as did the district court to permit the short statute of limitations to penalize a common employee, who, at no time resting on his rights, attempts first in good faith to reach a private settlement without litigation in the elimination of what he believes to be an unfair, as well as an unlawful, practice. We, therefore, hold that the statute of limitations, which has been held to be a jurisdictional requirement, is tolled once an employee invokes his contractual grievance remedies in a constructive effort to seek a 'private settlement of his complaint.' Culpepper also sought to settle his complaint in 1963 through the grievance procedures. We do not think that Congress intended for a result which would require an employee, thoroughly familiar with the rules of the shop, to proceed solely with his Title VII remedies for fear that he will waive these remedies if he follows the rules of the shop or to do both simultaneously, thereby frustrating the grievance procedure." 421 F.2d at 891-892.
 
 
 63
 Under the reasoning of Culpepper, the statute of limitations was tolled when, pursuant to the terms of the collective bargaining agreement, Moore initiated a grievance based on the October 24, 1966, incident. Unlike the situation in Culpepper,[39] we must decide when the tolling period ended.
 
 
 64
 It is undisputed that the grievance proceedings contemplated by the union contract terminated on February 16, 1967, when Moore received Sunbeam's third step answer denying the grievance. Thereafter Moore continued his efforts to reach a private settlement by writing to the president of Sunbeam in February, by holding a further informal meeting in March at which he was advised that the president would not meet with him personally and that no further action would be taken on his grievance, and, indeed, by his letter to the president of Sunbeam in August which also made reference to his prior denial of a leadman assignment.
 
 
 65
 Moore argues that at least the first letter to the president and the informal meeting in March should continue to toll the statute. If his argument were valid, we think it might equally support a continuation of the tolling until August. We believe, however, that the reasoning of Culpepper applies only to the formal grievance procedures contemplated by the collective bargaining agreement. Under this reasoning, although the incident actually "occurred" on October 24, 1966, for limitations purposes the "occurrence" was not completed until Moore exhausted his promptly initiated contractual remedies. We therefore hold that, with respect to the October 24, 1966, incident, the statute began to run on February 16, 1967. Accordingly, we agree with the district court that insofar as the civil rights complaint is predicated on that incident, it is barred.[40]
 
 
 66
 2. "Continuing" discrimination and harassment.
 
 
 67
 The district court also held that the claims relating to continuing harassment and discrimination were not covered by the charge file with the EEOC and, therefore, could not be the subject of Title VII litigation.
 
 
 68
 Neither the charge, concurrent affidavit, nor subsequent statement alleges any specific act of harassment and discrimination in the period between May 23, 1967, and August 7, 1967. The only allegations relating to this period were (1) a conclusory statement in the charge that the discrimination was "continuous" from January 11, 1967, to August 7, 1967; (2) a similar conclusory statement in the affidavit; (3) a statement in the affidavit that the August 7, 1967, transfer was requested because of "mental agony, and loss of wages brought on by these acts of discrimination"; and (4) a reference in the long chronology filed in March of 1968 to his October 24, 1967, "march" in protest of "unequal opportunities."
 
 
 69
 In context, the last mentioned allegation, numbered (4), cannot be fairly read as an allegation of racial discrimination. The first two allegations merely describe the continuing consequences of the earlier decision not to promote Moore. The failure to promote may be a "continuing" offense if it is followed by repeated promotions of others in preference to the complainant, but none of the documents before the EEOC specified any incidents of failure to promote after January 10, 1967. Cf. Cox v. United States Gypsum Co., 409 F.2d 289, 290-291 (7th Cir. 1969).[41]
 
 
 70
 We come finally to the allegation numbered (3) above. Here Moore alleged that he requested a transfer on August 7, 1967, because of "mental agony, and loss of wages brought on by these acts of discrimination." We think that a fair reading of this statement is that Moore did claim that he was a victim of discriminatory conduct sometime before August 7, 1967. We find no evidentiary support for a conclusion that any act of discrimination did occur between May 23 and August 7. The absence of evidence was not, however, the basis for the order entered below, and it is not our function to consider evidentiary questions in the first instance, particularly when the record is as complex as this one.
 
 
 71
 We therefore hold that the district court has jurisdiction to determine whether, during the period between May 23, 1967, and August 7, 1967, Sunbeam was guilty of any conduct which gave rise to a Title VII claim by Moore.[42] We cannot find any basis for such a claim against the union in the charge and related documents and, therefore, affirm dismissal as to it.IV.
 
 
 72
 One final contention requires discussion. Moore argues that he was denied effective assistance of counsel. Moore's court-appointed counsel effectively represented him at the taking of his deposition. However, after the motions for summary judgment were filed, but before he responded thereto, counsel asked leave to withdraw, apparently at Moore's request. He so stated in his motion, and Moore, although he had notice, did not appear to oppose withdrawal. Counsel on appeal argues that summary judgment might not have been granted had counsel continued to represent Moore. However, counsel on appeal has not demonstrated that any material could have been filed in opposition which would have significantly altered the record as it now stands on the Sec. 301 counts. Furthermore, there is no constitutional or statutory right to appointed counsel for the Sec. 301 claims; counsel was appointed under the discretionary authority of Title VII of the Civil Rights Act of 1964, Sec. 706(e), 42 U.S.C. Sec. 2000e-5 (e). On the Civil Rights Act count, Moore will now get all the consideration which trial counsel could have obtained for him. Thus, there is no showing of prejudice sufficient to cause us to conclude that the trial court abused its discretion in permitting Moore's trial counsel to withdraw.
 
 
 73
 To recapitulate: Moore's petition to review the order of the Labor Board is denied. The summary judgment dismissing all claims asserted under Sec. 301 of the Labor-Management Relations Act is affirmed. The order dismissing the claims asserted against Sunbeam and the union under the Civil Rights Act of 1964 is affirmed except insofar as the complaint contains allegations against Sunbeam relating to the period between May 23, 1967, and August 7, 1967. With respect to that portion of the complaint, the order of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 ORDER ON PETITION FOR REHEARING
 
 74
 In support of a petition for rehearing, the Equal Employment Opportunity Commission has filed a brief amicus curiae calling our attention to Vigil v. American Tel. & Tel., 455 F.2d 1222 (10th Cir. 1972), which affirmed the district court case cited in note 37 of our opinion. The Tenth Circuit held, in the alternative, (1) that the 210-day period was tolled by EEOC referral to a state agency or (2) that the EEOC could treat the charge as "filed" when received but could defer processing until the state agency had an opportunity to act.[1] The latter theory is the theory on which the the Commission based the regulation discussed and rejected at pages 18 through 20 of our opinion.[2] The EEOC has not attempted to defend its regulation in its amicus brief. Instead, it relies on the "tolling" theory of the Vigil case, which, as we have noted, is inconsistent with its own regulation. Although we did not expressly consider the tolling argument, since it was not urged upon us by Moore, it is foreclosed by our analysis of the statute. In our view the statute provides a basic limitations period of 90 days, which may be extended (or "tolled") to a maximum of 210 days. We do not think that Congress intended a further extension (or a second "tolling") to achieve the same purpose (time for state consideration) as the original enlargement of the 90-day period to 210 days in those states which have a Fair Employment Practices Agency. If Congress had so intended, we believe it would have included such a provision instead of the 210-day limitation. Moreover, the difficult questions of statutory construction will seldom arise if the complainant's original filing is within the basic 90-day period. Although we may share the EEOC's view that less diligence should have been required, we must respect the legislature's choice of the appropriate period of limitations, whether that choice was made to effectuate the policies of the Act or as an element of a compromise that enabled it to pass.
 
 
 75
 The EEOC has also called our attention to a Conference Report on H.R. 1746, Equal Employment Opportunity Act of 1972, which was issued shortly before our opinion was released and was printed in the Congressional Record for March 2, 1972, pp. H1694-H1699 (Daily ed.), and to a section-by-section analysis of the bill presented to the House by Congressman Perkins, printed in the Congressional Record for March 8, 1972, pp. H1861-H1864 (Daily ed.). The Conference Report cites Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 which we have followed, but does not even mention Vigil. The analysis presented by Congressman Perkins cites Vigil with approval. For reasons which are obvious, we do not believe that those 1972 references can be used to shed any light on the proper interpretation of the 1964 legislation, or can be used as evidence of what Congress might have done if Vigil had been decided differently.
 
 
 76
 We inadvertently stated that 60 days from October 19 was December 19, rather than December 18. Accordingly, our opinion is modified to permit the district court to consider any unlawful practice occurring after May 22, 1967, and prior to August 7, 1967. In all other respects, the petition for rehearing is denied, including the suggestion that the case be reheard en banc.
 
 
 
 *
 After the oral argument, a fact which Judge Cummings deemed disqualifying came to his attention; he did not thereafter participate in this case
 
 
 [1]
 International Association of Machinists and Aerospace Workers, Local 1129, District No. 8
 
 
 [2]
 Article 1, paragraph 5 provided:
 "5. In view of the provision for final arbitration of grievances arising under this agreement, the Union and its members, individually and collectively agree that during the term of this Agreement, they will not cause, authorize, encourage, permit or take part in any strike, and the Company agrees that there shall be no lockout.
 "(a) For the purpose of this Section, the term 'strike' includes a sit-down, stay in, slow-down, walk-out, curtailment of work, stoppage of work, willful refusal to perform assigned work, or other interference with work or orderly production, or picketing of the Company's plant or premises."
 
 
 [3]
 Moore was first employed by Sunbeam in May, 1962. During the ensuing five years he worked as a punch press operator, a power truck operator, and an inventory control clerk. In June, 1966, he passed a test which qualified him as a "leadman," a junior supervisory position. He attempted unsuccessfully to obtain leadman assignments in June, August, and October of 1966. He did receive leadman assignments which were not completely satisfactory between October 24, 1966, and December 14, 1966, and between December 27, 1966, and January 10, 1967. He was promoted to the position of stock clerk in August, 1967
 
 
 [4]
 The Trial Examiner found:
 "During his 5-year tenure with Respondent, Charging Party Moore filed a number of grievances against the Company. These included grievances concerning the assignment or distribution of overtime on three occasions (1964 and 1965, prior to his passing the leadman test); over allegedly unsafe working conditions (also prior to his passing the leadman test); over an alleged improper failure to assign him as a leadman to a particular department (Dept. 133; 1966); and over a request by him for a material handler to assist him as leadman in certain manual work (Dept. 437, 1966). At least the latter two were wholly unsuccessful."
 
 
 [5]
 13-CA-5837, dated August 23, 1963, which charged that Moore had previously been forced to resign because of union activity; and 13-CA-7772, dated February 27, 1967, which charged discrimination for union and other protected activities
 
 
 [6]
 13-CA-7102, filed July 19, 1965, which charged discrimination for filing a grievance; and 13-CA-7864, filed May 1, 1967, which charged discrimination for union or other protected activities
 
 
 [7]
 It was the subject of intraoffice communication within Sunbeam's management, but none of those busy executives made any reply, directly or indirectly, to Moore
 
 
 [8]
 GCX 3, p. 3
 
 
 [9]
 See Smith v. Kingsport Press, Inc., 233 F.Supp. 643, 646 (E.D.Tenn.1964), reversed on the facts, 366 F.2d 416 (6th Cir. 1966)
 
 
 [10]
 See Celanese Corp. v. N.L.R.B., 291 F. 2d 224, 226 (7th Cir. 1961); N.L.R.B. v. Hobart Brothers Co., 372 F.2d 203, 206 (6th Cir. 1967); Orphan v. Furno Construction Co., 325 F.Supp. 1220, 1221 (N.D.Ill.1971)
 
 
 [11]
 On October 4 the company wrote to Moore as follows:
 "This is to verify the fact that you were given an indefinite suspension from your work on October 3, 1967.
 "The suspension has been given you for conduct which we feel is not becoming a Sunbeam employee and which we feel we must investigate further. You will be notified of the result of our investigation at the earliest possible time." (GCX 5)
 
 
 [12]
 It stated in part: "To encourage a strike in the plant, and a boycott of the products manufactured here, can only effect your co-workers in an adverse manner." (GCX 4)
 
 
 [13]
 Sec. 706(f), 78 Stat. 261, 42 U.S.C. Sec. 2000e-5(f)
 
 
 [14]
 61 Stat. 156, 29 U.S.C. Sec. 185(a)
 
 
 [15]
 Count II was directed to Sunbeam; count III to the union
 
 
 [16]
 The arguments in this court, including Moore's, have proceeded on the assumption that the contractual grievance and arbitration procedure is the exclusive remedy set forth in the contract. The full text of that agreement is not before us, but we assume, no contrary argument having been made, that the grievance machinery was intended to be exclusive. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 657-659, 85 S.Ct. 614, 13 L.Ed. 2d 580
 
 
 [17]
 Neither the complaint nor Moore's brief in this court squarely argues that Sunbeam repudiated the contractual procedures. One argument in the brief seems to be based on the theory that Sunbeam did not wholeheartedly consider and investigate Moore's allegations and therefore did not give him fair consideration. However, the record shows that Sunbeam took all steps demanded by the union in connection with any grievance presented by Moore. Thus, the gravamen of this point in the brief is really that the results were unsatisfactory. If the union had agreed that Sunbeam's responses were improper, or that Sunbeam did not follow proper procedure, it should have taken the grievance to arbitration. If the union wrongfully refused to do so, then it breached its duty of fair representation and Vaca would apply. Thus, regardless of the terms in which it might have been stated, Moore's position is essentially founded on the theory of breach of duty of fair representation
 
 
 [18]
 Moore's complaint, in the second paragraph numbered 5 in count II, refers to violations of seniority and transfer provisions. From his deposition it appears there were two contracts involved: one covering the general unit (Moore's unit as a power truck operator); another covering the setup unit (Moore's unit when he was a leadman). Moore did not append a copy of the contract, but merely quoted the grievance and arbitration portions. This is a further indication that he was squarely relying upon the theory that the union denied him fair representation in refusing to take the grievances to arbitration
 
 
 [19]
 See note 16, supra
 
 
 [20]
 As to the suspension and discharge grievance, the union considered the contract as prohibiting Moore's activity. Indeed, at times in his deposition Moore himself seems to concede that he knew he was going outside contractual procedures to redress his leadman grievances. (The Labor Board, in separate proceedings, agreed with the union's view.) Certainly that interpretation was permissible and provided an acceptable reason for the union's decision not to submit Moore's discharge to arbitration. A union affidavit also explained the costs of arbitration and the considerations which go into a union decision on whether to arbitrate. Moore argues that there was no affidavit or any other basis for concluding on summary judgment that the union did not breach its duty of fair representation on the leadman grievances. The affidavit as to costs of arbitration and other considerations upon which a decision on whether to arbitrate is based would apply to the leadman grievances as well as to the discharge grievance. Even on summary judgment, the court may draw reasonable inferences from undisputed facts. Moore's deposition indicates that he equivocated from time to time as to whether the grievance was based on racial discrimination or on discrimination against him because of his prior grievance activities and N.L.R.B. charges. Moore agreed that he had no contractual right to a promotion. Moore cited no facts indicating that he felt other employees were discriminated against on racial grounds, which might lend support to this theory. From Moore's own account in his detailed deposition, one could reasonably infer that Sunbeam had made a clerical error in respect to his department 133 grievance and that subsequent transfers were genuinely aimed at making up for that error, even to the point of assigning him to a leadman's job in a department which did not really need a leadman. Moore was unclear as to the exact practice and contractual provisions as to temporary "step up" assignments to leadman jobs. From the record as a whole, it would not be unreasonable for the union to have concluded that Moore's leadman grievances had no merit, or had insufficient merit and significance to the employees as a whole to justify the expense of arbitration. Moore argues that if the inferences to be drawn from undisputed facts are themselves disputed, summary judgment may be inappropriate. Were the question before us whether, in fact, Moore's leadman grievances had merit, we might agree that summary judgment was improperly granted. But that is not the question before us. We need merely decide if the union acted in good faith in refusing to arbitrate the leadman grievance. We find no facts in Moore's deposition which can reasonably be construed as indicating bad faith on the union's part. On the contrary, the facts in his deposition itself provide a basis for a conclusion that the union did not breach its duty of fair representation
 
 
 [21]
 The two basic requirements-extreme diligence and exhaustion of state procedures-are further complicated by the fact that time limitations apply both to the filing of the complaint in the district court and also to the filing of the charge with the EEOC. In this case it is admitted that the complaint was filed in the district court within 30 days after notification from the EEOC as required by Sec. 706(e), 42 U.S.C. Sec. 2000e-5(e)
 
 
 [22]
 Section 706(d) provides:
 "(d) A charge under subsection (a) of this section shall be filed within ninety days after the alleged unlawful employment practice occurred, except that in the case of an unlawful employment practice with respect to which the person aggrieved has followed the procedure set out in subsection (b) of this section, such charge shall be filed by the person aggrieved within two hundred and ten days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency." 42 U.S.C. Sec. 2000e-5(d).
 
 
 [23]
 Section 706(b) provides:
 "(b) In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixtyday period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority. 42 U.S.C. Sec. 2000e-5(b)."
 
 
 [24]
 See Sec. 706(b) quoted in note 23, supra. The term "exhaustion" as used in the text is not strictly accurate because we treat the state procedure as "exhausted" after 60 days pass even though further state activity may take place. See Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1212 (1971)
 
 
 [25]
 More precisely, in Illinois, which has created a Fair Employment Practices Commission, that period is within 210 days after the alleged unlawful employment practice occurred, or within 30 days after receiving notice of the termination of the state proceedings, whichever is earlier. In this case it is the 210-day period which is relevant because the state proceedings had not been terminated within 210 days of the occurrence
 
 
 [26]
 Compliance with these limitations is jurisdictional. "The requirement that a complainant must invoke the administrative process within the time limitations set forth in section 706(d) is a jurisdictional precondition to the commencement of a court action." Choate v. Caterpillar Tractor Co., 402 F.2d 357 (7th Cir. 1968). "[T]he person aggrieved must first bring his complaint to the state agency and wait a minimum of sixty days before bringing his charge to the EEOC. Compliance with this provision has been uniformly held to be a jurisdictional prerequisite to the initiation of a suit in district court." Developments in the Law, supra, n. 24, at 1212
 
 
 [27]
 Moore argues on appeal that his deposition discloses he received a letter from the EEOC sometime between October 3 and October 19 which told him how to file a formal charge with the EEOC and which motivated him to go to the Chicago office to file his charge. Thus, he argues, there is no doubt that the EEOC did receive a copy of the October 3 "open letter" to Gwinn. However, the EEOC may routinely send out such information when getting any type of letter dealing with racial discrimination. The letter is not in the record, and Moore's deposition is not clear either as to its specific date or contents. It is, however, reasonable to infer from the nature of the "open letter" mailed to approximately 30 officials or organizations, that it was neither intended by Moore nor interpreted by the EEOC as a discrimination charge. In view of our decision, infra, on when the statutory period began to run, even the October 3 date for which Moore argues would not preserve the basic leadman issue (the failure to promote Moore on October 24, 1966) for trial. Furthermore, our analysis in rejecting October 19 as the date of filing, text infra, at notes 30-37, also applies to the October 3 date
 
 
 [28]
 In a statement filed on March 8, 1968, Moore stated that he discussed certain matters with the Illinois FEPC on March 7, 1967. Quite properly he does not rely on that incident as compliance with the exhaustion requirement because he would then have been under an obligation to file his federal charge within 30 days after the termination of the state proceeding, which he clearly did not do if the March 7 incident is regarded as a state filing
 
 
 [29]
 It was not until April 19, 1968, that the Illinois Fair Employment Practices Commission advised Moore of its determination that it had no jurisdiction over the charge filed with that body. Moore's deposition indicates that the EEOC referred the charge to the state agency. The record does not indicate the exact date of referral, but we think it reasonable to treat October 19, 1967, as the referral date from which the 60-day state consideration period begins to run
 
 
 [30]
 The Supreme Court's decision is thus consistent with an EEOC regulation which provides, in part:
 "[U]nless the Commission is notified to the contrary, on the termination of State or local proceedings, or after 60 days have passed, whichever comes first, the Commission will consider the charge to be filed with the Commission and commerce processing the case." 29 C.F.R. Sec. 1601.12(b) (1) (iii) (1971).
 
 
 [31]
 "[A] charge is deemed filed when the Commission receives from the person aggrieved a written statement sufficiently precise to identify the parties and to describe generally the action or practices complained of. . . ." 29 C.F.R. 1601.11(b) (1971)
 
 
 [32]
 Love v. Pullman Co., 404 U.S. 526, 92 S.Ct. 616, quoted in the text, supra
 
 
 [33]
 The interpretation urged upon us presupposes that the statute said "if there is a state procedure available, a charge with the EEOC must be filed within 210 days after the alleged unlawful employment practice." The statute, however, says "in the case of an unlawful employment practice with respect to which the person aggrieved has followed the procedure set out in subsection (b) of this section [filing with a state agency], such charge shall be filed . . . within two hundred and ten days. . . ." The difference is important and controlling
 
 
 [34]
 The statutory language was chosen "to keep primary, exclusive jurisdiction in the hands of the State commissions for a sufficient period of time to let them work out their own problems at the local level." Remarks of Senator Dirksen, 110 Cong. Rec. 13087 (1964)
 "If the practice complained of occurs in a State or locality which has a law prohibiting such practices and establishing an agency to deal with them and there is no such agreement, the individual complainant cannot file his charge with the Commission until the State or local agency has been given an opportunity to handle the problem under State or local law. However, after the agency has had 60 days to adjust the complaint, or after it terminates proceedings on it, the complainant may go to the Federal Commission. The 60-day period will be 120 days during the first year that a State or local law is in effect." Remarks of Senator Humphrey explaining the compromise to the Senate on June 4, 1964; reproduced in the Commission's "Legislative History of Titles VII and XI of Civil Rights Act of 1964," at p. 3003 (hereafter Leg. Hist. at . . .) (emphasis added).
 
 
 [35]
 "Section 706(d) establishes a 90-day period of limitations on the filing of a charge, with appropriate provisions to extend the period in the situation in which prior resort is had to a State agency. Moreover, section 706(d) is carefully worded to protect an individual who, in good faith, unnecessarily seeks to comply with the requirement of initial resort to State or local authority. Such a person will not lose his right to seek Federal relief simply because the 90-day period for filing with the Federal Commission has elapsed while he seeks to pursue State remedies." Senator Humphrey, Leg.Hist. at p. 3006
 Senator Dirksen entered into the Congressional Record an explanation of the compromise measure. Of Sec. 706 he said, in part:
 "New subsection (b) provides that where there is such State or local law, no charge may be filed with the Commission by the person aggrieved until 60 days (120 days during the first year after the effective date of a new state or local law) after proceedings have been commenced under the State or local law. . . .
 "New subsection (d) requires that a charge must be filed with the Commission within 90 days after the alleged unlawful employment practice occurred, except that if the person aggrieved follows State or local procedures in subsection (b), he may file the charge within 210 days after the alleged practice occurred or within 30 days after receiving notice that the State or local proceedings have been terminated, whichever is earlier. The additional 120 days is to allow him to pursue his remedy by State or local proceedings. . . ." Leg.Hist. at 3018.
 The legislative history as a whole indicates a basic purpose to require the complainant to make his initial filing within 90 days; the extension of the period to 210 days in certain states was plainly intended to permit him to "exhaust" the state procedures. There is no suggestion that complainants in some states were to be allowed to proceed with less diligence than those in other states. The above excerpts indicate that unless a complainant pursues his state remedies with sufficient diligence to permit the state, within 210 days, either to complete its action or to have 60 days in which to act without federal interference, he may not file a timely charge with the EEOC.
 
 
 [36]
 We cannot simply permit the Commission to treat the charge as filed on the 209th day and then delay any processing for 60 days while the state is considering the matter. Such an approach would run squarely afoul of another congressional command-that a complainant be able to go into the district court within a maximum of 60 days after his charge is filed if the EEOC does not achieve voluntary compliance. See Sec. 706(e); see also 29 C.F.R. Sec. 1601.25a(c) (1971); Cox v. United States Gypsum Co., 409 F.2d 289, 291 (7th Cir. 1969). Thus, if he were to insist on that right, and the Commission waited 60 days for the state to act, complainant could go into the district court before the Federal Commission had any time in which to act, also contrary to congressional intent. Of course, if a charge were filed on the 208th day and a state rendered a final decision on the 209th day, then there would be no impediment to application of the Commission's regulation
 
 
 [37]
 Our construction is fully consistent with the Supreme Court's decision in Love that the EEOC may "hold a complaint in 'suspended animation,' automatically filing it upon termination of the state proceedings." 404 U.S. at 526, 92 S.Ct. at 618. If, however, the date on which the complaint is automatically filed is more than 210 days after the alleged, violation, the charge is barred as untimely
 We have considered Vigil v. American Telephone & Telegraph Co., 305 F.Supp. 44 (D.Colo.1969), relied on by Moore, but cannot reconcile its reasoning with the scheme of the entire statute analyzed in the light of the history of the Dirksen-Mansfield compromise. Even though a statute of limitations may "permit a rogue to escape," the legislative commands must be respected. See Toussie v. United States, 397 U.S. 112, 123-124, 90 S.Ct. 858, 25 L.Ed.2d 156.
 
 
 [38]
 He argues here that the charge should be construed to encompass his suspension and discharge which occurred well after August 7, 1967. The first reference to the discharge in any document filed with the EEOC was as part of a long chronology which Moore submitted on March 8, 1968. Since that chronology did not allege any racial motivation in connection with the suspension and discharge, the EEOC did not treat it as an amendment to the charge which had expressly stated that August 7, 1967, was the most recent date of discrimination. Accordingly, since the suspension and discharge was not encompassed within the charge filed with the EEOC, it may not form the basis for a complaint in the federal district court
 
 
 [39]
 See 421 F.2d at 891 n. 4. Happily, we need not decide in this case all of the consequences of accepting the Culpepper rule. See Meltzer, Labor Arbitration and Overlapping and Conflicting Remedies, 39 U. Chi.L.Rev., 30, 48-50 (1971)
 
 
 [40]
 The final step in the grievance procedure on the Department 437 matter was also February 16, 1967. Thus, the statutory period on this incident also began to run on February 16. As to the January 10, 1967, transfer, no grievance was filed, and the statutory period therefore began to run on that date. These were the only specific incidents prior to August 7, 1967, identified in any of the documents submitted to the EEOC
 
 
 [41]
 In that case we said:
 "Had these charges [discrminatory layoffs] stood alone, and had the commission rejected them as untimely, insertion of the word 'continuing' may perhaps not have saved them." 409 F.2d at 290.
 In the present case, the Commission did reject the "continuing" charges and the conclusory allegations were of little more significance than the word "continuing" in the Cox case. One of the factors specifically listed by this court in Cox, 409 F.2d at 291, was that the Commission chose to accept the charge as timely. Here the Commission rejected the charges as untimely. Also in Cox we noted that the company had received notices of other charges of similar current discrimination at or about the same time. No such situation exists here. We said in Cox:
 "This court has previously, albeit with respect to a different requirement, indicated that the commission's decision to process a charge is important in determining whether the charge is adequate." 409 F.2d at 291.
 Our own review of the charge and other documents does not persuade us that we should disturb the conclusion of the Commission.
 
 
 [42]
 We do not foreclose the possibility that the district court, upon consideration of additional affidavits directed to the issue, might find summary judgment appropriate
 
 
 [1]
 These alternative holdings are also inconsistent since they result in different filing dates. The filing date is important because the complainant's access to a federal court is measured from the filing date. See note 36 of our opinion
 
 
 [2]
 We rejected that theory as inconsistent with the language and structure of the statute as a whole, the legislative history, and the Supreme Court's decision in Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679