**Wilma L. McINTYRE, Plaintiff,**

v.

**MICHELIN TIRE CORPORATION, Defendant.**

**Civ. A. No. 78–1548.**

United States District Court,
D. South Carolina,
Greenville Division.

Nov. 2, 1978.

Wilma L. McIntyre, pro se.

J. Hamilton Stewart, III, Greenville, S. C., for defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HEMPHILL, District Judge.

Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)[1], filed September 7, 1978, and defendant's subsequent motion for summary judgment, under Rule 56[2], Federal Rules of Civil Procedure, invite decision by this court. Plaintiff proceeds *pro se*, not having counsel[3], and has not filed in opposition or made request to do so. This is one of the countless and prolific suits begat by civil rights legislation; too often a person who quits, gets fired, or is otherwise terminated for legitimate reasons, can use this court to claim a discrimination which does not exist. The court will give careful consideration.

### THE MOTION TO DISMISS

Plaintiff, by summons and complaint filed August 29, 1978, and served on defendant September 1, 1978, alleges that plaintiff's employment rights were violated when Michelin sought to transfer her from one job to another. Although the complaint is less than clear as to what type of discrimination allegedly occurred, it appears to claim that plaintiff was discriminated against because of her race (black) and due to what she describes as a "less than lateral" transfer. Further, the complaint could be read to allege that her termination when she refused the transfer was discriminatory. For purposes of treating the motion, no analysis of these alleged facts is proper or necessary.

---

1. Fed.R.Civ.P. 12(b)(1) states: How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter . . ..

2. Fed.R.Civ.P. 56(a) provides: Summary Judgment. For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof.

3. Discussed later, infra.

The complaint contains no statement as the grounds for jurisdiction in this court. Nowhere is the existence of a federal question or diversity of citizenship alleged.

Rule 8 of the Federal Rules of Civil Procedure provides in part:

(a) *Claims For Relief.* A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) *a short and plain statement of the grounds upon which the court's jurisdiction depends,* unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it . .. (Emphasis added.)

Rule 12 of the Federal Rules of Civil Procedure [4] clearly provides that a proper responsive pleading to a complaint which does not set forth jurisdictional prerequisites is a motion to dismiss.

█ The complaint is dismissed with leave to reinstitute upon payment of all costs and the sum of $250 to defendant for attorney fees.

4. Fed.R.Civ.P. 12(b)(1) and (2) provide: How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person . . ..

5. "I had been employed by the above respondent since July of 1974 as an Accounting Clerk which was also the final position that I held with the Respondent Company.

"On 05–01–78 I was told by Ben Attaway, W/M, my immediate supervisor, and Geoffrey Hill, W/M, chief of my section that due to a reorganization of the investment accounting section, I along with Doris Waldrop, W/F, would be transferred to the accounts payable section and would perform the appropriate accounting duties in that section. This was a transfer with no cut in pay.

"I refused this transfer because I felt that the positions were not comparable in regards to the duties to be performed in the job. When I refused this transfer, I was terminated by Jim O'Connor, W/M, Personnel Manager and told that the position in accounts payable is all that I would be offered.

## THE MOTION FOR SUMMARY JUDGMENT

Defendant's motion for summary judgment should be granted. As shown by supporting material, not controverted by plaintiff, plaintiff has no cause. The court, upon a review of the convincing record, finds the case frivolous and worthy only of dismissal, as provided by 28 U.S.C. 1915(d).

## INTRODUCTION

Plaintiff filed Charge Number 041781322 with the Regional Office of the Equal Employment Opportunity Commission (EEOC) in Atlanta, Georgia, on May 31, 1978.[5] The EEOC investigated her charge, and on June 5, 1978, issued a determination finding no reasonable cause to believe the allegations in the charge were true. On August 29, 1978, plaintiff filed her *pro se* complaint alleging in general terms that she had been discriminated against in her employment because she is black. Plaintiff accompanied her complaint with a motion for appointment of counsel. On September 6, 1978,

"I believe that the above constitutes racial discrimination (Black) because:

"My former duties were divided up between Bobbie Tucker, W/F, Accounting Clerk and Paul Hamilton, W/M, in Fixed Assets, and I was given what I feel to be less responsibilities as an Accounting Clerk."

DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulation I issue on behalf of the Commission, the following determination as to the merits of the subject charge. All jurisdictional requirements have been met. Charging Party alleged that she was discriminated against by the Respondent by being demoted because of her race (Black). Examination of the evidence in the record indicated that there is not reasonable cause to believe that this allegation is true.

This dismissal concludes the Commission's processing of this charge. Should the Charging Party wish to pursue this matter further, she may do so by filing a private action in Federal District Court against the Respondent named above, within 90 days of her receipt of this letter and by taking the other procedural steps set out in the enclosed NOTICE OF RIGHT TO SUE:

On Behalf of the Commission:
/s/ District Director
6/5/78

defendant responded by filing a motion to dismiss because the plaintiff did not allege a factual or legal basis for the court's jurisdiction, addressed *supra.*

## MOTION FOR APPOINTMENT OF COUNSEL

Before considering the motion for summary judgment, since plaintiff asked for appointment of counsel, the court will consider such motion first, and see whether such appointment is in fact justified. The EEOC determination, at first blush shows plaintiff had no case, and suggests that that bureaucracy, noted for its champerty and harassment-suit pursuits, could find no reason to "put the law" to defendant. The court examines further.

■ Section 706(f)(1) of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e–5(f)(1)), provides for appointment of counsel in Title VII cases in certain limited circumstances. That statute provides in pertinent part:

> Upon application by the complainant and in such circumstances as the court *may deem just,* the court *may* appoint an attorney for such complainant and *may* authorize the commencement of the action without the prepayment of fees, costs, or security. (Emphasis added.)

The permissive word *may* clearly shows that no Title VII plaintiff possesses an absolute right to appointed counsel. Rather, the decision of whether to provide counsel lies solely within the judgment of the court. In exercising its judgment the court should examine three factors:

1. Whether the plaintiff has a meritorious claim.

2. Whether the plaintiff has made a diligent effort to retain counsel.

3. Whether the plaintiff has the financial ability to retain counsel.

4. Whether plaintiff is likely to succeed.[6]

## DOES PLAINTIFF HAVE A MERITORIOUS CLAIM?

■ In determining whether to appoint counsel, the court should consider the merits of the plaintiff's claims. *Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305 [7], (5th Cir. 1977) (the Fifth Circuit expressly rejected the notion that the merits of the claim should not be considered); *Sol v. I.N.A. Insurance Co.,* 414 F.Supp. 29 (E.D. Pa.1976) (plaintiff not entitled to appointment of counsel where it is not obvious that a meritorious claim has been presented); *Spanos v. Penn Central Transportation Co.,* (W.D.Pa.1971), aff'd 470 F.2d 806 (3d Cir. 1972); *In re Application of Jordan.*[8] The EEOC is the administrative agency charged with the responsibility for enforcing Title VII, and is presumed to have expertise in the area of civil rights violations. Consequently, the EEOC's disposition of a charge of discrimination is highly probative of the merits of a Title VII plaintiff's claim. *Caston v. Sears, Roebuck & Co., supra.* Initially, the EEOC considered McIntyre's Charge and found there was no reasonable cause to believe that the allegations were true. This determination is entitled to some weight. The South Carolina Employment Security Commission also considered McIntyre's termination, and imposed a disqualification for unemployment benefits after finding that she was terminated for insubordination because she refused to

---

6. To appoint a lawyer to pursue a frivolous or near-frivolous claim would surely be beneath the dignity and integrity of the court.

7. In *Caston,* the Appeals Court reversed a refusal to appoint counsel because the trial court leaned heavily on the EEOC determination [perhaps the court should ignore it, but it is a part of the record]. The court went on to declare:

> "We also unhesitatingly conclude that there is no automatic right to the appointment of

counsel" [130A], and "We also think that the district court may properly consider the efforts taken by plaintiff to obtain counsel." The court in the case before it has carefully considered the course plaintiff pursued along with the merits of the case as presented in the motion for summary judgment.

8. See also: *Spanos v. Penn Central Transportation Co.,* 470 F.2d 806 (3rd Cir. 1972); *Moore v. Sunbeam Corp.,* 459 F.2d 811 (7th Cir. 1972).

transfer to another section when her department was reorganized and her job eliminated.[9] The circumstances of McIntyre's discharge will be discussed in detail, *infra.* While the EEOC's determination alone may not be a sufficient basis for the court to conclude that the plaintiff's claim lacks merit (*Caston v. Sears, Roebuck & Co., supra; Harris v. Walgreen's Distrib. Center,* 456 F.2d 588 (6th Cir. 1972); *Robinson v. Western Elec.,* 3 FEP Cases 846 (7th Cir. 1971)), it is clear that the EEOC determination together with the decision of the South Carolina Employment Security Commission and the unrefuted affidavits and business records attached hereto is sufficient to establish that the plaintiff's claims are patently frivolous. See *Aiken v. New York Times,* (S.D.N.Y.1969) (plaintiff's claim held not meritorious since the EEOC and the New York Commission for Human Rights both investigated the claim and found there was no reasonable cause to believe that plaintiff was a victim of discrimination); *In re Application of Robinson,* (N.D.Ill.1970)

(when the EEOC has found a charge to be without merit, the application for appointment of counsel should in most instances be denied), aff'd sub nom. *Robinson v. Western Elec., supra.* See also *In re Application of Harris,* (N.D.Ill.1970) (employee not entitled to appointment of counsel where EEOC has made no reasonable cause determination); *In re Application of Jordan, supra.*

## THE EFFORT TO RETAIN COUNSEL

■ Considering the issue of appointment of counsel, the court should consider the efforts made by the plaintiff to obtain an attorney. *Caston v. Sears, Roebuck & Co., supra; Sol v. I.N.A. Insurance Co., supra; Spanos v. Penn Central Transportation Co., supra; Petete v. Consolidated Freightways,* 313 F.Supp. 1271 (D.C.); *In re Ramirez,* 282 F.Supp. 663 (S.D.Tex.1968). McIntyre claims to have approached only two attorneys in Greenville, South Carolina, about representing her. The court takes judicial notice of the fact that the telephone

**9.** McIntyre has appealed the decision of the Employment Security Commission Appeals Referee. A hearing on her appeal has not yet been scheduled. The original decision reads as follows:

FINDINGS OF FACT

The claimant worked for the subject employer for approximately four years as an accounting clerk. She was terminated on May 22, 1978 for insubordination.

The claimant's job in the investment account section was eliminated as of June 1, 1978 due to a reorganization of the department. On May 1, 1978, the claimant was informed that she was to be transferred to the accounts payable section with the same working hours and rate of pay. The claimant was scheduled to attend three training sessions so she could become familiar with her new duties. She was terminated on May 22, 1978 for insubordination because she had refused to attend the training sessions.

The claimant felt that the transfer to accounts payable was a demotion, and she refused to attend the training sessions. The claimant applied for a transfer to another department, but there were no openings available for which she was qualified. The claimant was advised by the personnel department to attend the training sessions and accept the job in accounts payable until such time as another job became available.

Decision No. 78–A–3581
Appeal No. 92,819

REASONS

Section 41–35–120 of the South Carolina Employment Security Law requires an indefinite disqualification to be imposed whenever it is found that a claimant has voluntarily quit a job without good cause. This Section of the Law also requires a disqualification of from five to twenty six weeks to be imposed whenever it is found that a claimant has been discharged for cause connected with the work.

The claimant did not voluntarily quit her job, but rather she was discharged for insubordination when she refused to attend training sessions for her new job. Such action on the part of the claimant is a disregard of the employer's interest, and she is deemed to have been discharged for cause connected with the work. Therefore, some disqualification is required under the law.

DECISION

The claims adjudicator's determination dated June 12, 1978, whereby the claimant was disqualified for an indefinite period of time from May 21, 1978 until such time as she requalifies for having voluntarily quit her job without good cause, is hereby modified to remove the indefinite disqualification and to impose a disqualification of definite length. The Tribunal finds the claimant to have been discharged for cause connected with the work, and a seven week disqualification is imposed from May 21, 1978 to July 9, 1978.

directory [10] shows there are approximately 400 lawyers in Greenville. McIntyre's efforts to secure counsel fall far short of the diligence that should be required.[11] See, *Puffer v. Cessna Aircraft Co.,* 308 F.Supp. 443 [12] (D.Kan.1969) (counsel not appointed although plaintiff alleged she had been refused representation by eleven lawyers). Further, since Section 706(k) of Title VII (42 U.S.C. § 2000e–5(k)) authorizes the court to allow the prevailing party a reasonable attorney's fee, it appears logical that if the plaintiff's claim has merit she will be able to obtain counsel on a contingency fee basis. *Green v. Cotton Concentration Co.,* 294 F.Supp. 34 (S.D.Tex.1968); *Norpel v. Iowa Highway Patrol,* (N.D.Iowa 1971). Absent a more diligent effort to obtain counsel than that exhibited by McIntyre, it would be unjust to burden the taxpayers with the cost of this lawsuit. *Johnson v. Hertz Corp.,* 316 F.Supp. 961 (S.D.Tex. 1970).

## PLAINTIFF'S FINANCIAL ABILITY TO RETAIN COUNSEL

■ Before proceeding to appoint a lawyer to work free for plaintiff, the court should consider plaintiff's financial ability to employ a lawyer. *Caston v. Sears, Roebuck & Co., supra; Harris v. Walgreen's Distrib. Center, supra; Edmonds v. E. I. duPont de Nemours & Co.,* 315 F.Supp. 523 (D.Kan.1970); *Petete v. Consolidated Freightways, supra; Green v. Cotton Concentration Co., supra; In re Ramirez, supra.* McIntyre has made absolutely no effort to meet the burden she has of showing that she is unable to employ a lawyer. *Caston v. Sears, Roebuck & Co., supra* (plaintiff has the burden of demonstrating financial inability to employ counsel). Ms. McIntyre has not filed an affidavit or even an unsworn statement listing her assets and liabilities so that the court can make an informed decision about her financial resources. In some cases where plaintiffs have filed financial affidavits, the courts have frequently found their assets sufficient for them to employ their own counsel without burdening the taxpayers with the cost of their lawsuits. *See, e. g., Puffer v. Cessna Aircraft Co., supra; Green v. Cotton Concentration Co., supra; Aiken v. New York Times, supra.* Significantly, although the court may have the power to order a member of the Bar to prosecute a Title VII action, there is no guarantee that the appointed counsel will ever be compensated for the services rendered. No funds have been appropriated to pay the fees of counsel appointed pursuant to Section 706(f)(1). *Sol v. I.N.A. Insurance Co., supra.* Accordingly, it would be unjust to appoint and require a lawyer to serve without compensation in this action, when there has been no showing of McIntyre's inability to assume the costs of retained counsel.

## MOTION FOR SUMMARY JUDGMENT

This court has previously determined the case should be dismissed, without prejudice, on other grounds (supra). Lest this court be required to read the file again, with accompanying waste of judge-time, the court has carefully considered the motion, and here reports.

### A. Facts

In the spring of 1978, defendant had two accounts payable sections. One section was a general accounts payable operation supervised by one Sherion Wood. The other was part of the investment accounting operation which was supervised by one Ben Attaway. The workload in general accounts payable had increased so that one additional employee was needed in that section. The workload in investment accounting was not as heavy. In order to keep from having to hire a new employee, the Controller, Geoffrey Hill, decided to merge the two

---

**10.** In addition, the telephone directory lists "Legal Services Agency of Western Carolina, Inc.".

**11.** The South Carolina Bar also has a well-publicized Lawyer Referral Service which provides a toll-free number for persons who wish to consult a lawyer.

**12.** Plaintiff in the case cited made no effort to show she could not afford to hire counsel.

accounts payable activities and reorganize investment accounting to make the sections more efficient. In a further effort to increase efficiency, the accounts payable section was to convert to a cathode ray tube system,[13] rather than a manual system.[14]

Before the merger and reorganization, Bobbie Tucker (white female (WF)), Doris Waldrop (WF), Wilma McIntyre (black female (BF)), Paul Hamilton (white male (WM)), Mike Davis (WM) and George Bridges (WM) worked in the investment section. Since Doris Waldrop performed an accounts payable function in the investment section, she was transferred to the general accounts payable section where she continued to perform essentially the same duties. The purpose of this move was to consolidate all accounts payable functions in one section. Wilma McIntyre's job was abolished and she was scheduled to be transferred to the general accounts payable section. McIntyre's duties were assigned to Bobbie Tucker, Paul Hamilton and George Bridges. Except for a small part of Paul Hamilton's work, which was reassigned to Debbie Ginn, Tucker, Hamilton and Bridges were to perform the duties McIntyre had done in addition to the functions they had previously been assigned. Tucker also assumed the duties of Gary Adams, who was transferred to the position of Engineering Controller.[15]

Geoffrey Hill decided to transfer Doris Waldrop because she engaged in accounts payable work in the investment section and because she was at the same grade level as the other clerks in the general accounts payable section. McIntyre was selected for transfer to general accounts payable because she was at the same grade level as the clerks in the accounts payable section and because she had worked in the investment section for four years and needed to broaden her experience if she was ever to be qualified for promotion to a higher grade

level. Bobbie Tucker, George Bridges and Mike Davis were at a higher grade level than McIntyre, Waldrop and the clerks in accounts payable. Consequently, moving them to accounts payable would have been an unwarranted demotion for them. On the other hand, Waldrop and McIntyre would continue to receive the same pay and benefits in accounts payable, they would continue to work the same hours in the same room and would continue to work for the Controller, but they would have different immediate supervisors. Importantly, the move would have given McIntyre the experience required for promotion to a higher grade level. Paul Hamilton was not selected for transfer to the accounts payable section, although he was at the same grade level as Waldrop and McIntyre, because he had not been performing his job in investment accounting well enough to be rotated to another job where he would have to learn new duties.[16]

After the merger and reorganization decision was made, the affected employees were given a 30 day notice of the change on May 1, 1978. All of the affected employees, including McIntyre, were notified individually by Geoffrey Hill. When Hill spoke with McIntyre, he explained that her job in the investment section was being eliminated and her duties divided among the people remaining in the section. Hill told McIntyre that she would be transferred to a position in general accounts payable at the same grade level. Later that day, McIntyre voiced several objections about the change to Hill. She claimed she did not know whether she could get along with Sherion Wood, the accounts payable supervisor, and was not sure she would enjoy the work in accounts payable. According to McIntyre, Bobbie Tucker should have been selected for the accounts payable position instead of her. Hill explained to McIntyre that since

---

13. A cathode ray tube is an electronic television type screen on which the various accounts appear.

14. This information is supplied in the affidavit of Mr. Hill, attached to, and supportive of, the summary judgment motion.

15. *Ibid.*

16. *Ibid.*

Tucker was at a higher grade level than the other employees in accounts payable, moving her would have been a demotion for Tucker. At that point, McIntyre claimed the transfer was also a demotion for her. Hill, however, explained that the accounts payable position would not be a demotion for McIntyre because the job in accounts payable was classified at the same grade level and called for the same level of responsibility as McIntyre's job in investment accounting. Hill also explained the Company's policy to rotate clerks between the various sections of the department so they would have a greater appreciation for the entire accounting function and be able to perform their duties more efficiently. He told McIntyre that since she had been in investment accounting for four years, it was time for her to transfer and gain other experience so that she would be qualified for a promotion in the future. At the conclusion of their conversation, McIntyre promised Hill she would attempt the accounts payable job.

The next day, Tuesday, May 2, 1978, McIntyre voiced essentially the same objections about changing jobs to Linda Morgan, her personnel representative, as she had to Hill. McIntyre complained that she would not like the new job and asked Morgan to find her some other job. Morgan told McIntyre that she would consider other positions for her, but advised McIntyre that locating other jobs at the same grade level which matched the skills of an employee wanting to transfer was often a lengthy process. Morgan assured McIntyre that she would consider her for another job even if McIntyre eventually was transferred to accounts payable and found that she did not like the accounts payable job. Morgan also assured McIntyre that the transfer was simply a lateral move and not a demotion. At the conclusion of the interview, McIntyre agreed to try the accounts payable job.

On Wednesday morning, May 3, 1978, Ben Attaway, McIntyre's supervisor, and Sherion Wood, the general accounts payable supervisor, told McIntyre that she should attend a special training class to be held that afternoon, to prepare her and the other employees for the new cathode ray tube accounts payable system. McIntyre told Attaway and Wood that she would not attend the class. Later that day, Attaway again tried unsuccessfully to persuade McIntyre to attend the class. When the class was held, McIntyre was not present.[17]

On Wednesday, May 3, 1978, Morgan again discussed the impending transfer with McIntyre. During the interview, McIntyre announced that she would not consider the accounts payable position and demanded that Morgan find her another job. When Morgan proposed the possibility of an expediting job McIntyre rejected the idea saying she did not want to work in expediting because she thought the people that worked there "caused problems". McIntyre and Morgan also discussed the possibility of typist/secretarial jobs, but McIntyre was not interested in the jobs because she lacked the necessary skills. Morgan reminded McIntyre that she had been spoken with about the importance of attending training sessions for the accounts payable work by three supervisors as well as herself and advised McIntyre that her attitude toward reassignment was seriously jeopardizing her opportunities with the Company.[18]

---

17. In the handwritten notations of Hill, attached as a summary motion exhibit, Hill notes (5/4/78):

"On Wednesday 3rd May, Sherion Wood held a meeting to discuss the operational aspects of the new Accounts Payable System. Wilma McIntyre was informed of the meeting by Sherion Wood and Ben Attaway, her supervisor, but she declined to attend. Ben Attaway then had a further talk with her to try to change her mind but her attitude did not change and she did not attend the meeting."

18. Hill has another handwritten memo in which he notes (5/3/78):

"Wilma called and came down to discuss further her situation. She said she did not even want to consider the new position. She wanted me to find her a job that gave her some freedom similar to her present job.

I told her maybe she would like J-expediting, or a similar position, but she commented—'I don't want to work in J, there are too many women that cause problems in working together.'

Morgan had a third consecutive conference with McIntyre on Thursday, May 4, 1978. During the meeting, Morgan told McIntyre that she had searched throughout Michelin and its affiliates for another job for her. However, Morgan explained that McIntyre must attend the special training classes and be prepared for transfer to accounts payable, if another position were not found by June 1, 1978, or leave the Company because her present job was being abolished. At the conclusion of the conference, McIntyre would not agree to attend the training sessions.

On the following Monday, May 8, 1978, Morgan had a fourth conference with McIntyre. When McIntyre was asked to agree to attend the training sessions and consider trying the accounts payable job, McIntyre adamantly insisted she did not want to change jobs. Morgan explained that she had continued to make inquiries about other jobs for McIntyre but had found no available openings. At the end of the interview, Morgan reiterated that it had been made clear to McIntyre that she would have to attend the training sessions or lose her job.

On Thursday, May 11, 1978, a written memorandum concerning the new duties of all employees affected by the merger and reorganization was distributed to all affected employees including McIntyre. In addition to the general memorandum, Hill personally gave McIntyre written instructions to attend a special training session on May 12, 1978. The memorandum noted that McIntyre had refused to attend the first training meeting on May 3, 1978, even though her supervisor, Ben Attaway, and her personnel representative, Linda Morgan, had explained that her attendance was mandatory. Hill further noted in the memorandum that it was imperative for McIntyre to attend a training session scheduled for Friday, May 12, 1978, because she would have to know the accounts payable duties if another suitable vacancy did not become available. In the memorandum Hill reminded McIntyre that if she refused to attend a second time, further action would be taken.

The same day, Thursday, May 11, 1978, McIntyre told Morgan that she had received a memo from Hill with a training schedule and notice she was to attend. McIntyre claimed she did not understand why she had not received an earlier notice. Morgan explained that she and the others needing training had been verbally told about the training session and since the verbal notification had not been sufficient for her, she was being given a formal written notice. Morgan warned McIntyre that her refusal to attend the training sessions was very serious and advised her that further action would be taken if she refused again. McIn-

---

She has no real recent typing experience so typist secretary positions have to be ruled out.

I told her she was really hurting herself by her attitude about the change and the different areas she did want to work in. Her complaints today were:

Her seniority should count.

She should have been told long before the announcement.

Her job should not have been affected, that Bobbie Tucker should have been selected for the job.

She was to attend special training classes conducted by Sherion Wood on the CRT, but she refused to even attend the first class. She was talked to by Ben Attaway, her supervisor, Geoff Hill and Dick Bennion, whom she contacted for advice & counsel, and myself.

On Thurs, May 4, 1978 Mr. Bennion asked me to talk with Wilma again, so I called her down to my office at 4:10 p. m. I again emphasized the importance of her attending the classes for these reasons:

1. I had to have time to find her a new position.
2. A similar pos. with same level.
3. If I didn't find her a job by 6/1/78 she would either have to assume the new duties or leave the company.
4. She needed the training in case I did not have time to find her a new job by that date.
5. She needed to be trained if this were to happen.

She still argued that she was right in her feelings and attitude and we were wrong. She never committed herself to attending the classes. She had to leave before I actually was finished with my conversation because she thought she might have car problems & needed a ride home.

Continuation of this to be held 5/5/78 in a. m."

tyre would not make a commitment to attend the scheduled training.[19]

Despite the verbal warnings and repeated counseling, McIntyre did not attend the second training class held on May 12, 1978. McIntyre's second insubordinate act prompted a written final warning which was read to her verbatim on May 19, 1978. The warning stated that her refusal to attend the training sessions constituted insubordination. At the time she was given the final written warning, McIntyre was told that a special make-up training class for her sole benefit had been scheduled for Friday, May 19, 1978, at 2:00 p. m. and that her failure to attend would be grounds for dismissal.

McIntyre refused to attend the special training session on Friday, May 19, 1978. She was then terminated for insubordination. Hill's recommendation that she be discharged concluded:

In order to provide you with every possible consideration, you were notified in your Final Warning that a third training session was to be held on 19 May 1978 at 2:00 p. m. Your attendance at this session was mandatory and you were notified in writing that your failure to attend this third session would constitute grounds for discharge. You refused to attend the third session, thereby violating the direct instructions of your supervisor for the third consecutive time.

J. J. O'Connor, the Personnel Manager, accepted Hill's recommendation to discharge McIntyre, and on May 22, 1978, her employment with the Company was terminated. At the exit interview, O'Connor briefly outlined the events preceding McIntyre's discharge and asked McIntyre if she still insisted that she would not transfer to the accounts payable section. When McIntyre again refused to transfer to accounts payable, the administrative details of the termination were completed. Had McIntyre agreed to the transfer and consented to attending the training sessions, the deci-

19. *Exhibit 3* reads as follows:

"5/8/78    Wilma McIntyre    (By Linda Morgan)

I asked Wilma to come to my office and discuss once more the situation of her change in duties.

Since she has not committed to her manager that she would take the change I asked her to give me a *yes* or *no* on whether she would try the training sessions and consider trying the accts. payable job. I asked if she had changed her mind on her attitude about the situation. She replied 'No, Linda it remains the same, I do not want to change job duties.'

I said, 'Wilma you know where this leaves you, since I have checked with MARC, Mt. Paris & Financial to see if we could possibly place her in another position and they do not have any openings currently available. I think Geoff, Mr. Bennion and I have made everything very clear to you concerning the change.' She seemed to understand exactly what I said, but showed no emotional change. She really doesn't seem to care whether she stays with MTC or leaves.

I asked Geoff Hill to talk with her to reaffirm her committment to us to not try the new position.

Those in the dept whose jobs are directly affected because of mgmt. changes are:
1.) Bobbie Tucker—added responsibilities
2.) Paul Hamilton    "    "
3.) Debbie Ginn      "    "

4.) Doris Waldrop—transfer to acct pay (Gen.).
5.) Wilma McIntyre  "    "    "
6.) Gary Adams      "    " Serv. B."

*Exhibit 4* reads as follows:

"Wilma McIntyre 5/11/78

Wilma came to see me about a memo she received from Geoff Hill and a training schedule notice that she was to attend.

She could not understand why she did not receive a notice prior to the one she received on 5/11/78.

I told her she had been asked like the others to attend the training session so she would be prepared to go into the accounts payable position in June. Since the verbal notification did not work we decided that a formal written notice was due. We again discussed the seriousness of the matter if she did not attend the second meeting. We would be forced to take further action if she again refused to accept. these directions given to her by her superior. She did not commit to me that she would attend the session on 5/12/78.

On Friday 5/12/78 she did not attend the training schedule and has not been back to see me since the 5/11/78 meeting in my office.

At this time further action will have to be taken."

(All of this is from a handwritten notation attached as a part of the exhibit to Hill's affidavit in support of the Motion for Summary Judgment.)

sion to terminate her would have been revoked.

■ The facts discussed and the effort to help plaintiff demonstrate that McIntyre's race had nothing to do with her selection for transfer from investment accounting to accounts payable. Rather, a business decision was made to reorganize the accounting department to make it unnecessary to hire an additional employee. To accomplish this objective, McIntyre's job was abolished and her duties assigned to other personnel. Since three of the six employees in investment accounting were at a higher grade level than the employees in accounts payable, they could not be transferred to that section without demoting them. Another employee in investment accounting, Paul Hamilton, had not performed well enough in investment accounting to justify his transfer to another section where he would have to learn new duties. The logical personnel to transfer to the accounts payable section were Doris Waldrop and McIntyre. Both of these employees were at the same grade level as the employees in accounts payable. Further, McIntyre had sufficient investment accounting experience and needed experience in accounts payable in order to develop the skills necessary for eventual promotion. Significantly, Doris Waldrop is a white female. Waldrop willingly made the change to accounts payable.

The reason for McIntyre's discharge is also apparent from the foregoing discussion. Her race had no bearing on the decision to terminate her. Rather, McIntyre was terminated for insubordinately refusing the direct orders of her supervisors to attend a training class to prepare her for the job in accounts payable. The Company's Employee Handbook clearly provides for terminating employees who "[refuse] to follow instructions or to perform work assigned by [their] supervisor[s]".

It is difficult to imagine a situation where a Company could be more patient than Michelin was with McIntyre, and it is difficult to imagine a more intractable and stubborn employee than she. When McIntyre objected to transferring to accounts payable, the Company told her they would try to find another job that she might like better. However, McIntyre was advised that finding a job that matched her skills and pay grade was difficult and might take some time. The Company promised McIntyre that they would make a diligent effort to find her another job before June 1, 1978, but asked that she attend training classes so that she would be prepared for the accounts payable job if the search for another position was unsuccessful. The Company also promised McIntyre that if she had to transfer to accounts payable on June 1, 1978, they would continue to look for another position for her, if she did not like the accounts payable job. None of the Company's efforts suited McIntyre. She refused to follow verbal instructions to attend the first scheduled training session. She was then given written instructions to attend a second training class and refused to attend again. McIntyre was counseled repeatedly by her supervisors and the personnel department, but adamantly refused to attempt the accounts payable job or attend the training classes. McIntyre was then given a final written warning and told that a special training class was to be held for her on May 19, 1978. She was explicitly reminded that her attendance was compulsory and advised that failure to attend would result in discharge. When McIntyre did not attend the training session for the third consecutive time, she was discharged. No Company should be forced to tolerate such flagrantly defiant acts under the guise of race discrimination.

The court has reviewed the file to determine if evidence of racial discrimination exists. No facts in dispute show such to be true. The company has a right to make improvements, promote the efficiency of its own performances. Such has been one of the necessary heartbeats of the free enterprise system. The facts recited here are not denied in the record. The suit is frivolous. Summary judgment is granted.

If plaintiff refiles as she is allowed to do, she will file at the same time her affidavit, and supporting affidavits, showing, under

pain of contempt for false statement, such facts as would cause this court to allow her to proceed on a discrimination claim. Defendant has to pay its attorneys to defend lawsuits, including this one, whether frivolous or not. Plaintiff infers she has no money to pay counsel fees.

The motion for summary judgment warrants dismissal and is granted, without prejudice.

AND IT IS SO ORDERED.